Case numbers 23-10-14 and 23-10-29, USA v. Adam Fox and USA v. Barry Croft Jr. Oral argument to be 10 minutes for each defendant and 20 minutes for plaintiff. Mr. Sweeney for the appellate. Good morning. Please the court. I'm Tim Sweeney on behalf of Barry Croft and if I could please have three minutes for rebuttal. I would appreciate that. I am going to address, your honors, the hearsay issue, the non-authorized vicarious admissions. I think it's an important issue in this case. My colleague, Mr. Nolder, will address the remor issue and the juror issue. Those are the two issues we'll focus on. This was a closed case, this case, this trial. We know that because Trial 1 resulted in two acquittals and the hung jury and it went to And the critical defense for Mr. Croft and Mr. Fox was entrapment. That aspect of the case, certainly that was one part of it. And critical to that, I believe, and the trial lawyers believed when they filed their motions in limine was we've got to be able to get in all these communications between these informants, people like Chappell and Plunk and Robeson, those three in particular, and these defendants, as well as the communications between the informants and their bosses at the FBI. And the judge really put the bar down on that and disallowed that almost in its entirety to the point that it disregarded, we believe, the authority, the precedent from this court, that Branham case, which is really pretty clear. This rule, 801D2D, is made for this type of a case, a case where entrapment is so critical, where you do have communications between government agents and you want those communications to be treated as admissions to the government. That's what the rule is. They aren't hearsay. There's substantive evidence that can be admitted regardless of whether the witness testified. So on a proper reading, a proper reading of Branham as you would see it, whose statements should have come in? All three of the informants? Yes, Your Honor, right, correct. And why is that? Why is Branham that broad? Well, I mean, these were statements made by agents of the government. These were agents of the government, no question. But that's the question. Why are they agents of the government? I mean, would your reading of Branham extend to any confidential informant off the street? Somebody comes in, they say, hey, you know, I saw this guy dealing drugs on the corner of Fourth and Post. Well, there was more than just, these people weren't just, you know, people that showed up with information. These were people who were working as part of the team. This was a prosecution team, an investigation team. They weren't somebody that just came in off the street and said, I have some information. They were paid, especially Chappell. Chappell was paid $55,000, plus he got a free computer. I mean, and they were, here's an interesting fact. I think a detail that's emblematic of how closely they worked together, how much they were part of this team. 3,500 text messages between Chappell and Chambers, the head of this investigative unit at the FBI. That's astounding. That's 16 a day. How many of those were admitted into evidence? Virtually none of them. Well, some of them were. Some of those were. But that was the only exception, Judge, that Judge Junker recognized, was that if it's something that an FBI agent says, that's okay if it's an employed FBI agent. But he drew the line. He said, but not for somebody like Dan. Dan's don't come in unless he's parroting the words of his supervisor. That's not the rule. That collapses C into D. C under 801D2 is, it's made by a person whom the party authorized to make the statement. Judge Junker read that to say, okay, if it's authorized by Chambers, it's okay. But that's C. That reads out D. D is the unauthorized vicarious admissions. And a lot of those are going to be things the government doesn't like, because they're going to be things that these guys maybe shouldn't have said, but they had the authority to say it, because they're working within the scope of the agency. And it's really an unfair, I'm sorry, Judge, let's hear. Is there any line, I mean, you've told me that Dan Chappell, I think is his name, was on payroll, he's making $55,000, he's embedded in the organization. Is there a line to be drawn between him and the other two? And would that make a difference to your case? No, I don't think there is a line here, because I think, particularly Robeson, was equally embedded. I mean, Robeson ran the, go back, the Dublin thing, the Cambria FTX, the People's thing, the Luther thing. I mean, Robeson was sort of the guy that's bringing all this stuff together. He's actively involved in organizing and promoting these critical events that were used by the government to convict these two men. I mean, Robeson is hip-joined to Chambers and to Chappell. They are part of the team. And I think that's- So even if we, so let's say we think you're right, that the district court misapplied Branham. Why is that error not harmless, given the evidence of predisposition in this case? Oh, geez, I just don't think it can be viewed as harmless. First of all, I think it's structural error. I start there, and I've- I've read that, but if you don't, if you reject that, it's Nils' burden to show harmless, number one. I don't think he can meet the burden. It's not mine to show that it wasn't. So it's their burden. Number two, I mean, take a look, if you would, and you may already, this attachment to the motion. It's 200 examples of text messages. This is at 383-1, page 2575. And it goes through all these different text messages. It could and should have been admitted. And I did this last night. I went through, and I, okay, on this topic, here's a- so, for example, the drive-by on the 29th of August. You see with these text messages, this was the government's plan. I mean, this was their drive-by. So is it your position that all of these statements, and I want to make sure you can hear me, all of those statements are really going to the inducement prong of entrapment? They go to both, Your Honor. I think they go to- How do they go to predisposition? Because one of the five things you're supposed to look at in predisposition, and this is in our brief, the nature of the government's inducement or persuasion. That's the fifth element of the predisposition elements the courts look at. And similarly, whether the suggestion of criminal activity was made by the government, that's the second of the five you look at when you're looking at predisposition. On two of the five, it's in the wheelhouse of what did the government do? How involved were they? And you've got these text messages which shows the Ypsilanti thing. That was all the government. The 9-12 drive-by, the nighttime thing where they drove 45 minutes to pick up Barry. They were so involved, they were deciding who was going to be in which car and who was going to be sitting in which seat. I mean, this was a- I use the metaphor, and I know it's only a metaphor of a Broadway play. That's what this was. They were the director. They were the director. They were the writer. They were the music. Some of this evidence did come in. So one text message that came in between an informant and an agent, keep working to solve the differences within the group. Try to show them that they were brought together by Croft and he has good ideas. You just have to find common ground. Show them the good ideas Croft brought and say what is workable and what is not, compromise may be needed on both sides. Right. So that, I think, goes to your point that there was some direction here by the informants, maybe schemed by the FBI. And so it's not that this whole line of argument didn't come in. Some evidence came in. Certainly these arguments were made. And entrapment, as my colleagues were noting, entrapment's not an easy defense to prove. Well, but that's the thing, I think. I mean, if you look at this attachment and you kind of look at all the things that weren't allowed, juries are persuaded by evidence. And this was a close case. We know that by virtue of trial one. This additional evidence would have made the difference. Because, you know, you can have one little piece. You're right, Judge Riedler. There was some of this got in. But it was not the stuff that 801D2D permits. That stuff was all shut down. These guys were entitled to the benefit of 801D2D. There shouldn't be a trial against these two guys that says you can't rely on 801D2D. Because that's what this trial was. And that's an unfair trial. And it may very well be true that some of it did get in. But not enough of it that if all of it had been permitted, it would have been a different trial. The ability to persuade jurors really matters. All right. I think you're over your time. Although, you don't seem to have a light, which would be very helpful. I do see the light. Oh, you see it. And I see it. OK, I didn't realize where I was supposed to be looking. Unless my colleagues have further questions.  Good morning. May it please the court, I'm Steve Nolder. I represent the appellant, Adam Fox, in this case. And I would like to reserve two minutes of rebuttal. As my friend, Mr. Sweeney, said, I would like to focus my presentation today on the first issue of my brief. And that deals with the Remmer issue. And in that, we allege that the district court abused its discretion by depriving Mr. Fox of a constitutionally meaningful Remmer hearing. And this circuit stands alone in placing the burden on the defendant to show that a juror was biased. And the standard is that the defendant must show there's a colorable claim of extraneous influence that somehow likely affected the jury's verdict. So that's the standard. That's the burden that the defendant must show and must come forward with credible evidence to demonstrate that in order to be entitled to a Remmer hearing. And so if that's our starting point, I think it was after the first trial day, Mr. Blanchard, Mr. Croft's lawyer, received a telephone call from a person who identified himself by name and number and provided information about juror number six that, if true. Mr. Nolder, is your argument mostly a procedural one in the sense that the judge obviously did a lot here? The judge had his clerk reach out. The judge talked to the juror. Is your argument basically just that when the judge talked to the juror, defense counsel had to be there? Or is there more to it? Well, there are two opportunities here, I think, that the judge aired. The first would be on August the 12th when the judge does have this ex parte meeting with the juror in his chambers. And we believe at that point in time that there was sufficient evidence to justify the lawyer's participation, presence, and questioning of the juror. And on August the 11th, yes. And your basis for that is what? Because our case law maybe is a little less friendly to parties objecting or who have concerns about jurors than maybe some others. Ironically, we also stand alone on the first issue. So we have some interesting case law at issue in this case. But what's your best case for the need for the defense counsel to be there every time a judge talks to a juror? On August the 11th, when the judge informed the parties that he was going to do this in an ex parte manner, he cites the parties to US versus Gagnon, which is a US Supreme Court decision. And the irony of Gagnon is in that case, the judge, after learning of potential misconduct or potential bias by the juror, he invites the juror to his chambers. And belatedly, he then asked Mr. Gagnon's lawyer to come to chambers as well. And after the judge continues his examination of the juror, then he invites Mr. Gagnon's lawyer to question the juror, which the lawyer does, asks two questions, and satisfies himself that the juror could continue to be fair and impartial. So that's, first and foremost, the Gagnon case would support our position that the lawyer should have been present at that time, because there was a colorable claim. And if you look at the Stafford decision, now that there's the rule, is the rule every time a judge talks to a juror about an issue related to the trial, counsel always has to be there? Well, if you look at it, I don't necessarily believe that's the ironclad rule, Your Honor. But if you look at the Stafford decision, which I cite, it's the Seventh Circuit's decision in my first brief, these sorts of mid-trial meetings should only occur when there's a strong indicator of bias. And if that's the standard, there's a strong indicator of bias justifying this mid-trial meeting with the juror, I think that that also translates into there's a colorable claim of extraneous influence. And so that would be my position, that at that point in time, that the judge should have invited counsel to be present and to question the juror. Because if you buy the Seventh Circuit's decision in Stafford, there was at least a strong indicator of bias. Otherwise, there shouldn't have been the meeting in the first place. So from your reading, a strong indicator of bias is the same as a colorable claim of bias. I would. I don't read those as being the same thing. So I guess I'd like a little bit more explanation as to why you think that that's the same thing. Well, again, just looking at colorable, I think that's something that's plausible. And strong, to me, would be even a higher standard. And so if there's a strong indicator of bias, by its very nature, the subset would assume that it's a colorable claim as well, just based on the logical and natural reading of it. So here your position is that there was a strong indicator of bias? Otherwise, that mid-trial meeting wouldn't have occurred. Judge Yonker must have believed there was some substance to the allegation. Otherwise, he wouldn't have convened this meeting with the juror on August the 12th. And I think that there was additional information that came forward in this meeting. The juror indicated at this meeting. And one of the things, I assume, if you don't buy my argument that the lawyers should have been there, then you have to look at whether Judge Yonker's questioning of the juror was fulsome, whether it was probative, whether it was meant to ferret out this issue, and to steal a phrase from Judge Moore in Lanier 3, or whether it was bobtailed. And in this case, Judge Yonker, after the niceties of meeting the juror in chambers, how did he lead? He said to the juror, I don't have any of this on tape. I don't have anybody saying this under oath. But here's what the allegation is. And the juror, of course, denied it. But what the juror then followed up with is, hey, I'm aware there was a first trial, indicating he followed the first trial. Two, that he did tell co-workers that he had jury service. And three, when Judge Yonker asked him, did you ever make any comments that would indicate bias or prejudice against Mr. Croft and Mr. Fox, there wasn't an ironclad denial. He said, I don't remember. And so that's the record as the hearing ended on August the 12th. So then the investigation by the defense continues as the trial continues. And person number two, he's located. He's interviewed. And person two, he says much the same thing as person one. Again, it was hearsay. These comments were made directly to either person one or person two, person one being the caller to Mr. Blanchard. But nonetheless, it was a parallel discussion between the investigator and person two. Person two used the same phraseology to describe what he heard. The statements were post-trial. This was as the trial was going on. I think it was filed in an affidavit to a post-trial motion for a rumor hearing. Because Judge Jonker, when he initially had the conversation with the juror, would not have had access to all the information that came in later on. That's right. It's a little hard to criticize him for not knowing things that were investigated later on. I agree with that as it relates to the first interlude with the juror. So now we're talking about post-trial? That's right. Because like I said, there were two opportunities here. The mid-trial interview with the juror as well as the post-trial motion for a rumor hearing. So post-trial now is a little bit different because the initial meeting has already happened. Absolutely. So post-trial, you're now saying, just looking at all the evidence, the juror should have been excluded? Or in other words, I understand your point about the first meeting, which is the judge should recognize there's enough here that I need to bring the parties in and discuss this more. Right. But the judge doesn't have the information that you bring out later. So what's the difference between the? So how should we look at the post-trial meeting or post-trial hearing where this additional evidence is presented to the judge? Then what was supposed to happen? And I want to answer your question, but I am over time. So if I can answer the question. Well, the investigation continued as the trial was going on. And so the defendants could establish a colorable claim of extraneous influence. And so they developed Person 2, interviewed Person 2. Person 2, also a colleague of the juror, heard the same statements attributed to the juror, and he added additional comments about he was afraid to come forward because juror number six's mother was a work colleague at the same business. And she had an exception. I was trying to distinguish between the errors at each stage. I think they're a little different. I think that it only became more compelling after the trial because Person 2, Person 3, and everything that was developed by the defense investigator, and couple that with everything that was developed before the first meeting. And so I would say, in tandem, if you compress all of that, it justified a rumor hearing post-trial. Thank you. I have one quick question to which I'd like a quick answer. Yes. If we agreed with you on the rumor hearing issue, what's the remedy? A new trial. That's what I thought. Linear 3 says clearly, if someone's deprived of a constitutionally meaningful hearing, it's a new trial. Thank you. Thank you. Good morning, Your Honors. I'm Nils Kessler for the United States. I'm from the Western District of Michigan, and I tried the case below. I had planned to start with a discussion of the sufficiency of the evidence, but I understand my colleagues have picked two other issues. Do the court have a preference as to which one we address first? Yeah, I would spend my time on hearsay. Well, in this case, Your Honor, you guys, you judges, actually identified the primary thing here, which is if there's predisposition, then the rest of it is really academic. And all of the statements, none of which were identified specifically, all the statements in general that the defense has been suggesting are indicative of inducement, all of those statements go to inducement. If the jury found that they were predisposed, none of that matters. But that's only- But isn't that not quite right? Because it seems to me that the case law suggests that it's kind of a sliding scale. Like the more you are induced, the less predisposed you need to be. In other words, two of those factors on predisposition really go to inducement. And so they're related, they're not separate. Well, this court has held that it's only entrapment if the government originates a criminal design and implants it in the mind of an innocent person. So if they believe that they were not innocent people, but they were already predisposed to commit the crime, then it really doesn't matter about inducement. But that's only the first layer. In this case, the court's ruling was not only consistent with Rule 801 and Branham, but I think the defendants are making the mistake of suggesting, which they did earlier, that as long as something is exempted from hearsay, it's admissible. But that's not right. There are also two additional hurdles that have to be cleared. For a statement to be admissible, it has to not only be non-hearsay, it also has to be relevant, and it has to pass the bar of 403. Can I just ask on your first point, I mean, there's a lot of room between innocent and predisposed. Most people are probably in the middle.  We're not all perfectly innocent, we're not all predisposed, we're somewhere in the middle. And so you can get closer to the predisposed line by the atmospherics that you're experiencing. Sure, absolutely, you could. But this court has held that inducement is excessive pressure, repeated and persistent solicitation. And that's not where a lot of it is. But that's their point. I mean, the point that they're making is the jury never heard all these statements, repeated pressure, that if they had come in, they would have seen, I mean, whether this is right or not, this is what they argued, that they would have seen that the government informants were just pounding on them, make a plan, make a plan, make a plan, you're just sitting around, you're all talk, you're no action, make a plan. Why isn't that, I mean, surely that's relevant. Theoretically, yes, but if you look at the case, if you look at the actual facts in this record, they don't identify any statements like that. There simply weren't any statements that they've identified with any specificity where you have an informant actually telling them that we should go kidnap the governor or actually putting that kind of pressure on them. You simply don't have it. They're arguing this general proposition, which isn't wrong, that if there were statements like that out there that went to inducement. Say you had statements of somebody saying, I'll give you a million dollars to do this, or I'm threatening you, I'll threaten your family if you don't, but there's nothing like that. Is that what's required? But our case law doesn't say that you have to threaten somebody. I mean, I would understand a rule that said you're induced if you put a gun to the head of the defendant or threaten their family or something. But our case law says things like encouragement, friendship. It has to be, Your Honor, it has to be more than just friendship. Right? That's what the case law says, friendship. The case law is also pretty clear that it has to be more than just, the Polson case from the circuit says it has to be more than just providing facilities or opportunity. So something like giving somebody a ride to the place where they discuss their plans or being friendly to somebody and saying, which is what you expect any confidential informant to do is be friendly enough that they'll talk in front of you. Those things are not solicitation to commit a crime. Nobody's disputing that they were, might've been nice to them. Well, counsel, let me ask you. So you said that there's an issue here because they're not pointing to any particular statements that were made. Does that work in the flip too though? Because if the district court kind of made a categorical ruling that these statements are not coming in, they're hearsay, was there an obligation by the defense to say, but Your Honor, as to this, this specifically shows this. I guess I don't know how to weigh that out. Yes, I think that the obligation, the burden is on them to show that. And the court did not make an across the board ruling that nothing that you want to get in can come in. The court actually did give them much of what they were asking for under Branham, which is agent statements were allowed to come in. Many, many of the statements of, for example, Dan Chappell, who they talk about, did come in. He was on the stand for two days and most of those were up on the big screen and they questioned him about them. But the court said, I will let you get in those statements if you can show me ones that were actually made with specificity that you want to get in so that I can decide whether they're relevant or not or whether they pass 403. That is their burden to show that there is something that was improperly excluded. Okay, here's one. I think we need to start going up north. I think we need to start going up north. So for me, a big part of this case is that they cased out the Traverse City location twice. But here's the informant saying, I think we need to start going up north. So could you attribute the idea that we need to go stake out the governor's residence to the informant? No, you can attribute that entirely to Adam Fox. I know that's something that they suggested, that that idea came from the government, but there were five different instances where Adam Fox suggested that before they ever got to that point where that statement was made. As early as July, he was talking about reconning the palace that she worked out of and actually, Mr. Robeson's reaction to that was, are you kidding me? Which is not the idea coming from the informants. In July, Fox was talking about doing research to find the most advantageous place to launch and he suggested that they go see her house in Traverse City. He's the one who said in a recording that the jury heard who wants to do a recon up to her house on Sunday and he was the one providing the address to the house. How about this one? I know you mentioned spring and expletive. I think we're not going to have that long. And one of the arguments in this case is that there was really no defined plan and date to execute and here you have the informants saying things like, we need to get up there, we're not going to have that long, we need to keep moving, there's a lot of stuff about we need to keep moving, we need to keep the plan going, come on guys. Adam Fox was the one who said we can't wait until November and he's the one who actually, the jury heard a recording of Adam Fox saying while they were all there that we need to be prepared and keep reconning the house because this is going to be opportunistic. We have informants saying some of the same things too so it's sort of whose idea was it first. The things I think that you're referring to are things that actually came out at the trial so I don't see how that could actually be a problem here. You had informants talking with him about his plans but they heard the- You admit that a number of states, some, I have questions for your friend on the other side, certainly there was some evidence along these lines that did come out that showed that the government informants were at least part of the plan here, whether they let it or not is a point of dispute but you would agree there was a lot that didn't come in, right, there were a lot of messages that didn't come in. You can quantify it. Your friend said most or many didn't come in. I think they have a burden to identify something that should have come in with specificity. It can't be just numbers, it can't just be that they had 8,000 texts or whatever and they didn't all come in. They have a whole chart in their brief, they think all of those statements should have come in. And they didn't identify anything in that, the chart is not statements entirely, a lot of it is just their spin on what they want to get in but it is on them to actually say here's something that I want to get in that is not only non-hearsay but is relevant and they didn't do that. I don't think they can just say there was lots of stuff out there which we're not going to define that should have come in. So you're saying that Judge Nowaker didn't make specific rulings on these statements that are included in what we're looking at. And he certainly would have had they identified something with any specificity. Oh, so you're saying it was their burden in the trial court to say no judge. But once the judge had already made a blanket ruling that none of these statements were going to come in under 801 D2G? No, he didn't make a blanket ruling that none of them would come in. He basically said I will let anything in. No, he said it can't come in unless it's regurgitated by the government. Unless the government put the words in the informant's mouth and the informant spit it back out to the defendants. That's consistent with Branham. Oh, come on. Really? The statements actually have to be made. Branham says that the defendant was engaged in a process of getting the trust of the, I'm sorry, the informant was engaged in the process of getting the trust of the informant. And everything related to gaining that trust comes in as an agent statement. And that's what the facts were in Branham. But that's not what they were, the vast bulk of what they were trying to get in here were statements between the informants and the CHSs. And you can't be induced by a statement you never heard. So they wouldn't have passed the relevance bar. They wanted to get in statements between, for example, Jason Chambers and Dan Chappell. And those aren't statements that the defendants ever heard. So there's no way they could have been induced to do anything by statements they never heard. What they wanted to get in, a good example of it, was things where they talked about, for example, I don't think, in my opinion, that they're going to come together to agree. That's somebody's opinion early on that nobody ever heard. I know, Judge Riedler just read you some, but like CHS Steve says, if we don't talk about actually doing what the F we need to be doing, I'm done with these meetings. We have to have objectives. We have to have forward F-ing units operating. I mean, make a plan, make a plan, make a plan. Why isn't that relevant? Because, first off, as to predisposition, that makes it irrelevant. But also, those statements, all these kind of things did come in, and we're talking about Mr. Robeson's statement when? I don't have that date in my notes, I'm sorry. I can tell you the page site, R383-1, but 2578, but I don't have the date. But that's not telling anybody what to do. The evidence is clear that they may ask them, what is your plan? But the plans are all clearly coming from the defendants. Pressing them to disclose what their plans are is not the same as saying, we need to go kidnap the governor. I read this, well, I read this as saying, we need to make a plan. But in any event, are you, so it sounds to me like today, well, you just argued that it was consistent with Branham. If we disagree with you on that, you seem like you're arguing harmless error in this court, but you didn't really argue harmless error in your brief. I see one sentence in your brief that argues harmless error. And it's your burden. Clearly, it would be harmless error as well. I mean, given the vast amount of evidence of their predisposition, they were talking about doing this before they ever met the informants. I think that's the key point to keep in mind. We have them talking about taking out tyrants as, Adam Fox said we need to take out tyrants as hostages two weeks before he had ever met a government informant. Barry Croft had been talking about it much longer, saying which state is gonna be the first one to take down their governor and hang them for treason. That's predisposition. They were talking about doing it. And even if you accept that they were pressured to disclose what their plans were, that's not the same thing as putting plans in their mind. All of those kind of statements would go to inducement, and the evidence was very strong that there's predisposition. I think one of the examples too of how the record has been mischaracterized in a lot of these instances, one of my colleagues here just brought up the notion that Croft was told by an informant to, or the informant was told to try and get Croft to go back to the group. That was a different group. There are reasons why those kind of things are excluded as irrelevant, because it wasn't these people. Croft belonged to a different militia that had other plans that were planning to kick him out because he was too violent, and they were afraid he was gonna get them in trouble. But as came out while we were discussing this below, it was a completely different group. So there's no relevance to this conspiracy. There's no way Mr. Fox or Mr. Croft could have been induced by the fact that Barry Croft was encouraged to go back to a different group. Can I ask you one other record question? So again, to me, they didn't argue sufficiency this morning, but one of the main points of contention is again that there was no actual plan, an actual date to carry out the proposed kidnapping, and maybe there doesn't have to be. But one of the things I saw on the record that seemed to sort of focus the timing was this concern that Governor Whitmer would become part of the cabinet after 2020, the election. And so things really needed to happen in the fall, maybe before November, before she got Secret Service protection. Whose idea, who raised the concern about her potentially being in the cabinet, meaning that the plan needed to go forward soon that fall? Was that Fox or Croft? Was that one of the agents? Was that someone else? I believe that was Ty Garbin, Your Honor. Ty Garbin was the one who brought that up when they went back to the campsite after they had reconned her house. And both of the defendants actually were talking specifically about that, and they did have an agreement at that point. You had Barry Croft said that's why they needed to use a 37 millimeter grenade launcher that he had given them to take out her detail. And he told Mr. Franks right after that, if we're gonna launch an operation of this magnitude, you need to be prepared to walk away from your life. So they had agreed at this point to the exact words he was talking about, a quick, precise grab on that governor, Ms. Whitmer. That's Mr. Croft's words. And there's no question that they had an agreement when they were out there at the lake, because Barry Croft was pointing out across the lake and saying those three lights over there, that's her house. And you heard, the jury heard them both on a recording talking about how they needed to extract her across the water. So there's no question that they both had an agreement at that point. Now as to Your Honor's question about the timing, that's the only thing they hadn't agreed on. They had agreed on the place, and they went there and reconned it, and they agreed on how they were gonna do it. The only thing they hadn't nailed down is the timing, because you couldn't nail down exactly when she would be at this cottage. That's why Adam Fox's words, and you can listen to that recording, he told everybody, we need to be opportunistic and be ready to strike when the asset arises. And as the jury heard, the asset was Governor Whitmer. So they did have an agreement on everything. But actually, the case law from this circuit and the Williamson case is that they don't have to agree on all the details or the timing. Just that they're going to do it, and somebody has to carry out an overt act. We can ask about the juror issue. Yes, Your Honor. So, assuming I think that, at least for Judge Jonker's initial consultation with the juror, that there wasn't a requirement that defense counsel be there. But then post-trial, there's a lot more information submitted to the district court. Why wasn't the district court then required to do more investigation and maybe follow up some of the leads that the prime investigator had brought forward? Frankly, I would encourage the court to read their submission in 383-1. It actually didn't make it more credible. It made it less credible. What all those submissions established is that you had triple hearsay, somebody who raised a concern and then had to admit that it hadn't come from him, he'd heard it from someone else, who in turn said he heard it from someone else who wouldn't come forward with it. And during this chain of transmission, you also had somebody saying that they thought that their office was being surveilled by Black Lives Matter or something along those lines, and express an opinion. I mean, okay, some things there are more credible than others, but didn't they add to the number of employees who purportedly heard the juror say something along the lines of, I'm going to convict? No, you didn't have, it's not like you suddenly had three people who heard it. What you had was just a longer chain of hearsay transmissions. So you really had nobody who heard it who was willing to come forward. You had one person who supposedly heard it, but what you really had was one person who said they heard it from another person who said they heard it from another person who wouldn't confirm it. That's not three people hearing it. So I think the judge made the right call in this case. As the courts pointed out, the standard is abuse of discretion because the trial judge is in the best position to determine the scope of proceedings necessary. And that's what the court did. There wasn't a strong indicator of bias on the part of the jury here. What the court had to weigh was this chain of triple hearsay that wasn't confirmed, versus on the other hand, you had a juror who had sworn to do their best to be fair and impartial. And he questioned that person, and as the court noted, it's not like the judge just blew this off. The judge actually used his discretion and took a nuanced approach. This court pointed out in the Geokai case that a mid-trial Remmer hearing risks influencing jurors and is not appropriate in every case. And that's actually what the court avoided here was the idea of bringing attorneys in to start cross-examining people because as the court pointed out, that was a real risk here that subjecting a juror to that would bias them or would sour them on one side or the other, and that's exactly what he avoided. As far as the Gagnon case, that's another one that I think it not only doesn't say that counsel need to be present for all those interactions, the Supreme Court in that case specifically said that counsel don't need to be present for every interaction and that it can be counterproductive if you have defense counsel and the prosecution there. So counsel, I know because I was there, counsel did have an opportunity to weigh in and talk to the judge. We did discuss it with the judge in chambers and there is a transcript of it. So the judge did not in any way blow it off, he just used a nuanced approach to it. He was in the best position to assess the credibility of the allegations and he was also in the best position to assess the credibility of the juror who he spoke to. So I don't think there's anything in the record here that would establish that he abused his discretion in any way. Did the court have any other questions you'd like me to address? No, thank you. Thank you very much. We'll hear rebuttal. Can I just ask you the first point, I asked your friend on the other side, this idea that the governor was gonna get Secret Service protection after the election and so that he needed to move quickly. Do you agree with your friend on the other side that that came from one of the defendants or conspirators? I have to beg a lack of memory of that. I just don't remember that detail. Here's the thing about trials. I mean, trials are about telling your story, giving your narrative, trying to persuade. And being able to persuade, armed with the rules of evidence is what trial courts need to permit. And this trial court really took out, you don't want D2D, it took it out. I mean, what they were, and Nils was right, I mean, they were allowed to do some things, but only if chambers authorized it. But that's C. Authorized statements are C. D was sort of removed from the book, and it really did matter here. I mean, you gave some examples, Judge Rehler, but there's so many others in this table here. This table's are- Are there any specific examples of specific statements that you tried to get in that the court said, no, you can't get that one out? Well, I think there are- I recognize you're saying there was this blanket ruling, but if we don't agree that there was just a blanket ruling, which of these statements, because your briefing doesn't make clear, which of these statements, number one, did you try to get in that went toward inducement and that the court said, no, that's not gonna come in under 801- I think the court's ruling was unambiguous. The pretrial ruling, and it came from trial one, so it wasn't like they were not operating with some knowledge as to how the court approached this issue. Trial one was the ruling, and it applied in trial two, and it said, you're not getting any of this in. This stuff on your table, unless it complies with these requirements, it's not coming in. And so I think with respect to what was excluded that should have been permitted, it's all on this table, and your honors were reading some of them, and then there's others. I do think that table is a wealth of information that is the difference between conviction and acquittal, because it denied them the ability to tell their side of the story. And this is Sherman. I think it's nice when you can stand up and cite the US Supreme Court, but I can cite this Sherman case, because what it says is, at trial in an entrapment case, the accused may examine the conduct of the government agent. That's what you gotta be able to do. And Nils says, well, the stuff between Dan and Chambers, they never really heard it, so it doesn't really matter. No, that stuff matters, because it highlights the conduct of the government agents. Here's what these guys were doing. It may not be that Fox and Croft heard all the sausage making that was going on to sort of trump up this thing, but it was going on relentlessly between Dan and between Chambers. And those were admissions of government agents as to how they were leading these guys along. And it's about a narrative. It's about persuading a jury. And when you're denied the ability to use the rules of evidence where they benefit you, that is an unfair trial, particularly in a conspiracy case where that other aspect of 801D, the co-conspirator thing, is being used against you at every turn. There's gotta be fairness, and there wasn't here. And I think this case needs to be reversed and be sent back for a new trial for that reason. Thank you. Oh, we'll hear rebuttal from your co-counsel. Thank you. If there aren't any questions about the Rimmer hearing, I'd like to take a stab at answering Judge Riedler's question on the introduction of this Governor Whitmer becoming a cabinet member. I would differ with Mr. Kessler on who introduced this idea. If you look at page 31 of my brief, I think I highlight at least the passage that is relevant to this. And Mr. Chappell picks up Mr. Fox and drives him to the Luther FTX. This is September the 11th and 12th when the Luther FTX is ongoing. And according to the transcript, it's record number 842, page 15,354. During this travel, Mr. Fox is talking about timing. And at that point, Mr. Chappell, then the informant, introduces the fact that Governor Whitmer could quite possibly become a member of the Biden administration, and because of that, would have an enhanced security by the Secret Service, making the operation untenable at that time. How does Fox respond? He says, my training's inadequate. My skills are inadequate at this time. He doesn't want to proceed. And then Chappell then, he then says, well, it would have to be pushed to the spring and summer, and that would be an unlikely event. And so that's at least how I've characterized the record. I hope that I didn't miss the issue about Mr. Garbin introducing it, but at least my reading of the record is Mr. Chappell introduced that. So if there aren't any other questions, thank you. Thank you. All right, we thank you for your arguments. They were helpful. The case will be submitted.